**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

DENNIS J. O'BRIEN,

        Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

No. C04-4100-MWB

**REPORT AND RECOMMENDATION**

———————————

### *TABLE OF CONTENTS*

*I.*    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

*II.*   **PROCEDURAL AND FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . **2**

    *A.*    *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
    *B.*    *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
        *1.*    *Introductory facts and O'Brien's hearing testimony* . . . . . . . . . . **3**
        *2.*    *Sharon O'Brien's hearing testimony* . . . . . . . . . . . . . . . . . . . **10**
        *3.*    *Christine Pardo's hearing testimony* . . . . . . . . . . . . . . . . . . . **11**
        *4.*    *O'Brien's medical history* . . . . . . . . . . . . . . . . . . . . . . . . . . **11**
        *5.*    *Vocational expert's testimony* . . . . . . . . . . . . . . . . . . . . . . . **26**
        *6.*    *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **28**

*III.*  **DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND**
      **THE SUBSTANTIAL EVIDENCE STANDARD** . . . . . . . . . . . . . . . . . . . **31**

    *A.*    *Disability Determinations and the Burden of Proof* . . . . . . . . . . **31**
    *B.*    *The Substantial Evidence Standard* . . . . . . . . . . . . . . . . . . . . . **34**

*IV.*  **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**

*V.*   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **39**

## I. INTRODUCTION

The plaintiff Barry D. O'Brien ("O'Brien") appeals a decision by an administrative law judge ("ALJ") denying his application for Title XVI supplemental security income ("SSI") benefits. O'Brien claims the ALJ failed to consider the Iowa Department of Human Services determination that he needs nursing home level of care, failed to consider that he would have to miss three or more days of work each month, and failed to make a proper credibility evaluation. (*See* Doc. No. 7)

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. Procedural Background

On September 14, 2001, O'Brien protectively filed an application for SSI benefits, alleging a disability onset date of June 30, 2001. (R. 17, 460)[1] O'Brien alleged he was disabled due to "HIV, weight loss, lesions on legs, lack of energy, neuropathy, depression, anxiety, panic, poor grip & grasp in both hands with pain, numbness, tingling[.]" (R. 460) He stated his condition limits his ability to work because he gets tired and weak and misses a lot of days of work. He stated, "A cold to me is very bad and can quickly turn into a much more serious illness." (*Id.*) His application and request for reconsideration both were denied. (R. 393-94, 403-07, 410-13)

Pursuant to O'Brien's request, a hearing was held before ALJ John P. Johnson on May 20, 2004, in Sioux City, Iowa. (R. 43-93) O'Brien was represented at the hearing by attorney Frank C. Tenuta. O'Brien testified at the hearing, as did his wife Sharon

---

[1]The official transcript also includes documentation relating to previous applications for benefits filed by O'Brien. *See* R. 94-392, 395-402, 421-22, 429-58. For a summary of O'Brien's previous applications for benefits, see the ALJ's opinion at R. 17.

O'Brien, and Christine Pardo, a home health worker who had worked for O'Brien for two years. Vocational Expert ("VE") Elizabeth Albreck also testified at the hearing.

On June 20, 2004, the ALJ ruled O'Brien was not entitled to benefits. (R.11-2614-30) O'Brien appealed the ALJ's ruling, and on September 2, 2004, the Appeals Council denied O'Brien's request for review (R. 9-11), making the ALJ's decision the final decision of the Commissioner.

O'Brien filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 2) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of O'Brien's claim. O'Brien filed a brief supporting his claim on March 11, 2005 (Doc. No. 7). The Commissioner filed a responsive brief on May 2, 2005 (Doc. No. 10).

The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of O'Brien's claim for benefits.

## B.  Factual Background

### 1.  *Introductory facts and O'Brien's hearing testimony*

O'Brien was born in 1964. He has two children, who were ages eleven and twelve at the time of the hearing, but he was never married to their mother and has no contact with her. (R. 48-49) On October 11, 2001, he married his current wife, Sharon. (R. 52) At the time of the hearing, O'Brien, Sharon, and Sharon's son Steven were living in an apartment in Sioux City, Iowa.

O'Brien completed the eleventh grade in school, during which he was in special education classes. (R. 48) He indicated it was hard for him to learn. Now, he cannot

spell well, but he can read "a little bit," except for "big words." (R. 71) He can read the newspaper and is able to understand most of what he reads. He attended some GED training classes while he was incarcerated, but he was unable to complete his GED. (R. 71-72)

When O'Brien left high school, he worked at a gas station fixing tires and pumping gas. Next he worked for several years as a plumber's assistant, from about 1982 to 1988. (R. 48) The job required him to carry heavy loads, such as tile, concrete, piping, and dirt. (R. 73) He was paid in cash "under the table." (*Id.*) The job ended when the plumber died in 1988. (R. 73-74)

Between 1988 and 1994, he worked sporadically in general labor types of jobs, mostly in construction. (R. 50, 74) He estimated he had to lift and carry forty or fifty pounds in those jobs. (R. 74)

O'Brien was hospitalized in 1990 for a suicide attempt. He was drinking and using other drugs at that time and became depressed, leading to his suicide attempt. (R. 49)

In 1993, O'Brien worked briefly changing tires on semi trucks. He had to lift up to seventy pounds on the job. (R. 74)

In 1994, O'Brien was diagnosed with HIV. He applied for disability at that time, but his application was denied when he failed to show up for a hearing because, prior to the hearing, he was incarcerated "for attempted car jacking and burglary." He was in prison from December 1995 to September 1998. (R. 50) After he was released from prison, O'Brien worked for Shelton's Tank and Spring Cleaning in Indiana, where he used a sprayer to clean water tanks. (R. 50-51)

O'Brien went back to prison in 1999, when he violated the conditions of his parole by using drugs and failing to keep in contact with his parole officer. (R. 72; *see* R. 458). He finally discharged his sentence on June 6, 2000. (R. 51) He has done little work

since his release from prison. He worked briefly at a plastics factory in Indiana, manufacturing outhouses. He operated some type of electric drill or tool on an assembly line. The job was performed standing up, and required him to lift twenty to twenty-five pounds. He left the job to move to Kentucky, to help his brother regain custody of his brother's children. (R. 74-75) His most recent job was driving cars out of a car wash in Kentucky. He kept the job for a little over a month, and then he and his wife moved to Iowa, because O'Brien was having trouble getting back on his HIV medication consistently in Kentucky. (R. 52-53)

When he was first diagnosed with HIV disease, O'Brien was started on AZT therapy, as well as an antibiotic. He has received ongoing medical treatment through the years, but he stopped taking his medications when he went back to prison after his parole revocation because he did not want the other inmates to know he was HIV-positive. (R. 53-54) O'Brien indicated he "wanted the disease to take its course, . . . kind of like another suicidal thing." (R. 54) O'Brien started taking a new medication in Kentucky, when he was released from prison, but it made his side hurt. He stopped taking it, and when he moved to Iowa, in February 2001, he was started on a different medication. (R. 54-55) He started seeing a doctor at Sioux Community Health in late February or early March of 2001, but according to O'Brien, his doctor moved away. He quit going to Sioux Community Health because a "team aide" for HIV/AIDS patients was always present during his examinations and O'Brien "wanted to be more private with [his] . . . medical care than having people walking in and stuff like that[.]" (R. 56) He started seeing a Dr. Kimberly Neuharth in Onawa, Iowa, and when she moved her office to Panora, Iowa, he continued to see her there. (R. 56)

O'Brien's attorney questioned him about office notes from Siouxland Community Health discussing O'Brien's use of pain medications. O'Brien explained he had a

disagreement with his doctor about pain medications, leading him to change doctors. (R. 56-57)

O'Brien had an appointment scheduled with an infectious disease specialist at the University of Nebraska at some point following the hearing. He indicated he had started a new medication but his T-cell count and viral load were continuing to rise, so he was referred to the University for testing to see if he was resistant to the new medications. (R. 57)

O'Brien went to the emergency room at some point within the year preceding the hearing, complaining of sharp pain in his side. According to O'Brien, his blood pressure was "way off" and he had a high temperature. He was treated with I.V. fluids and began to feel better after he urinated several times. He was discharged early the next morning, declining to be admitted for further treatment because he "just wanted to go home." (R. 58)

At the time of the hearing, O'Brien was around 5'10" or 5'11" tall. He weighed between 220 and 230 pounds, noting he had weighed as much as 250 in the past. He explained his weight fluctuates a bit because there are times when he is unable to eat or get out of bed and sometimes he does not feel well enough to eat. In addition, he drinks Ensure, which curbs his appetite, and some of his medications also affect his appetite. (R. 59)

O'Brien's wife works about twenty hours per week. The family's income comes from his wife's employment, food stamps, Section 8 housing assistance, and Title XIX assistance for his medical needs. He has a home health worker, Christine Pardo, whose wages are paid by the State of Iowa. (R. 60) She comes by to check on him on Monday, Tuesday, Thursday, and Saturday each week, and monitors his medications. (R. 76-77)

O'Brien last used illegal drugs about three years prior to the hearing, and he last drank alcohol a little over two years prior to the hearing. (R. 60) He does not drive at all. He initially stated this is because his medications prevent him from driving, but he later stated he lost his license as the result of an accident in 1985 or 1986, and he "just never went . . . to get a license." (R. 61) He admitted he drove several times without a license between 1985 and 1995, but stated that now, either his wife or his health care worker drive him around. (R. 70-71)

O'Brien used to enjoy making model cars, but now, his hands and arms cramp up when he handles the small pieces so he no longer builds model cars. (R. 61-62) He used to bowl, but can no longer bowl due to pain. He stated it is "impossible for [him] to throw a ball down the lane." (R. 62) He still can play games, watch television, and read the newspaper. He stated there are no other activities he has curtailed due to his condition. (R. 61-62) He described his typical day as follows:

> I get up in the morning at about 8:00 or 8:30. You know, I'll have breakfast and take a shower or a bath. And I'll go through the newspaper and watch some TV and have lunch. And then after lunch, I'll take a nap. And I usually take a nap for about an hour or two hours. And after that, I'll get up and my wife will be leaving to go to work. She leaves around 4:00 or 4:30. And my stepson will come home, and we'll usually sit back and watch TV and have dinner and we'll talk and I wait for my wife to come home. And then usually, I'm usually in bed by 10:00 or 10:30 at night.

(R. 62)

O'Brien has pain "[m]ost of the time" in his arms, legs, back, and neck, that he described as "tingling and numbness and sharp pain." (R. 63) He has some problems with walking, and he has diarrhea most of the time. He estimated he goes to the bathroom two or three times in the morning. If he were working, he would require the

flexibility to go the bathroom whenever he needed to; he would be unable to adhere to specifically scheduled breaks. (R. 63) He also suffers from nausea and fatigue. (R. 63-64) O'Brien stated his diarrhea problem is related to his new medications, and attempts to remedy the problem with other medications have not been successful so far. (R. 76)

O'Brien wakes up frequently during the night and seldom gets a full night's sleep. He has night sweats and sometimes awakens to find the bed soaking wet. The time he gets up in the morning depends on how much sleep he got the night before. If he awakens and feels bad, he will lay in bed for awhile. He naps for one to two hours in the middle of the day. (R. 64) Three to four times a month, he is too sick to get out of bed. (R. 66-67) Also, about four times a month, he may be able to get out of bed but he is still too sick to leave the house or do much of anything. (R. 67)

O'Brien has problems with lesions and sores on his legs which, according to O'Brien, his doctors have said are due to HIV/AIDS. O'Brien called it a type of cancer, and stated he has "had holes in [his] legs close to [his] bone . . . to where they wouldn't heal up and all of that." (R. 65) He sees a podiatrist who has prescribed a cream that O'Brien applies to his legs twice daily. He also has sores on his torso. In addition, he indicated he has problems healing. He stated when he first moved to Sioux City, his platelets were "very, very low." (R. 65)

O'Brien has frequent mood swings, with his mood swinging "up and down, up and down." He stated, "It's a constant reminder every day, you know, that I have HIV/AIDS. . . . [I]t's something that's never left my memory. You know. It's constant all of the time." (*Id.*) He gets angry with his wife and stepson frequently. (*Id.*) However, he does not get angry or have problems getting along with his neighbors or acquaintances, and he has never had problems with supervisors or coworkers. (R. 77-78)

8

As far as caring for his personal needs, O'Brien is able to take a shower. If he takes a bath, his home health care worker will help him get in and out of the tub and sometimes helps him bathe. He needs help at times closing zippers and buttons and putting on his shoes because there are times when he is unable to grip or feel things with his hands. (R. 66, 79) He does no housekeeping or cooking. Those tasks are handled by his wife, his stepson, and his health care worker. (*Id.*)

O'Brien does not do much walking. He opined he could walk a block or two without stopping and resting. If he stops and catches his breath for three or four minutes, then he can walk a few more blocks before resting again. (*Id.*) He opined he could carry between ten and twenty pounds, but not frequently or repetitively. He could stand for an hour or hour-and-a-half before having to take a break, for a total of up to three or fours hours in a day. Similarly, he could sit for an hour to an hour-and-a-half before having to change positions, for a total of two to three hours in an eight-hour day. He opined he could work for about four hours before having to lie down. He indicated his medications make him drowsy and he has problems remembering day-to-day things. He has difficulty concentrating and his mind wanders. (R. 68, 70, 77) Regarding his inability to sit for long periods, O'Brien indicated he needs to stretch his legs frequently to prevent spasms, and if he sits for too long, his knees will shake. According to O'Brien, these leg problems are due to problems with his nerves. (R. 70)

He doubted he could use hand control because his hands cramp up a lot and they shake. He is right-handed, and his right hand tends to give him the most problems. He experiences numbness and tingling in his hands, and stated they "fall asleep a lot." (R. 69) He is unable to kneel down, crouch, or crawl due to pains in his legs, back, and arms, and he has trouble with balance. (R. 69)

According to O'Brien, "[s]everal doctors" have recommended he see a mental health professional for treatment. He indicated he has been through support groups at Siouxland Community Health, and he has seen a mental health professional about problems with his stepson. O'Brien stated the doctor recommended his family seek family therapy to help him deal with his stepson's ADHD. (R. 79)

2. **Sharon O'Brien's hearing testimony**

Sharon O'Brien ("Sharon") married O'Brien on October 11, 2001. She works about twenty hours a week at O'Ryan Mortgage Company.

Sharon stated O'Brien is unable to do any kind of work around the house. She helps him dress and bathe, and she and her son cook and clean. She stated it is difficult for O'Brien to zip and button his jeans, and to lace up and tie his shoes and boots. Sometimes he needs help getting in and out of the bathtub, and she helps him. (R. 80-81)

Sharon estimated O'Brien gets a good night's sleep maybe twice a week. She indicated he tosses and turns and has night sweats, and she has had to change the bed linens in the middle of the night. She stated he sleeps with a fan on him year round because of his night sweats. She sometimes sleeps in another room so she can get some sleep. (R. 81)

According to Sharon, four or five times a month, O'Brien is unable to leave the house. (*Id.*)

Sharon indicated she helped O'Brien fill out all the history questionnaires and other forms in connection with his application for disability benefits. She stated she usually fills out "every questionnaire, because it's hard for him to hold onto a pencil and whatnot." (*Id.*) O'Brien will dictate his responses to her, and she will fill them in. (*Id.*)

### 3. *Christine Pardo's hearing testimony*

Christine Pardo works for a home health care service. As part of her job, she provides services to O'Brien. Her wages are paid through DHS. At the time of the hearing, she had been providing services to O'Brien for two years. She met him through friends a couple of months before she started working with him. (R. 82-83)

Pardo estimated she spends twenty to twenty-five hours per week assisting O'Brien. She cooks meals for him, sometimes helps him in and out of the bath, puts on his shoes and socks, gives him his medications, takes him to and from appointments, changes his bedding two or three times weekly, and does some cleaning. Pardo stated that three or four times a month, on average, O'Brien is unable to get out of bed. (R. 83)

In Pardo's opinion, O'Brien has "a pretty good attitude" about his situation. According to her, O'Brien makes an effort to do things by himself. (*Id.*)

### 4. *O'Brien's medical history*

O'Brien alleges a disability onset date of June 30, 2001. The record contains medical treatment notes and other records submitted in connection with O'Brien's earlier applications for benefits which the court will not discuss. (*See supra*, n.1)

In July 2000, O'Brien was seen at Saint Margaret Hospital in Hammond, Indiana, complaining of headache, blurred vision, chronic diarrhea, and trouble sleeping. He reported that he had been incarcerated for the previous year, and he had not taken medications for his HIV disease while he was in prison. Laboratory testing confirmed that O'Brien had a low T-cell count consistent with AIDS (*see* R. 739). It appears a head CT was ordered (*see* R. 730), but the record does not contain a report from the CT or evidence of what treatment, if any, was given to O'Brien in July 2000. (*See* R. 729-42)

On July 15, 2001, O'Brien was seen in the emergency room with complaints of pain and bleeding in his ear. He was diagnosed with an ear infection and tonsillitis, and ear drops were prescribed. (R. 744-49) At a follow-up with a family medicine physician, the ear drops were continued, and O'Brien was prescribed Ultram and Advil for pain. (R. 763)

O'Brien returned to the emergency room on August 31, 2001, complaining of back pain, stating he had fallen against a railing while moving a couch the preceding day. He also complained of difficulty bending over, stating he "gets stuck." (R. 755) Doctors prescribed Toradol and Prednisone. (R. 751-56)

On September 11, 2001, O'Brien was seen in a hospital in Glasgow, Kentucky, with complaints of cough, fever, and fatigue. The record is unclear regarding whether any treatment was administered. (*See* R. 758-60)

On January 15, 2002, O'Brien underwent a consultative examination by Jeff Reichard, M.D., at the request of Disability Determination Services in Kentucky. O'Brien reported he was unable to work due to spasms, cramps, and shooting pains in his back, arms, hands, and feet. He stated he had last seen a doctor in September 2001, for pneumonia. He noted he had been HIV-positive since 1994, and he had last worked in October 2001, at a car wash. He stated Xanax and Vicodin had improved his musculoskeletal symptoms in the past, but he had not been on those medications since moving to Kentucky in July 2001. O'Brien gave a recent history of weight loss, shortness of breath, and chronic cough, and he was uncomfortable both sitting and standing. He denied any changes in bowel habits, or other symptoms. (R. 765)

Dr. Reichard found the range of motion of O'Brien's cervical spine to be within normal limits, and he noted O'Brien could ambulate without limping or use of ambulatory devices. O'Brien's muscle and grasp strength and manipulative ability were normal, as

were his reflexes and range of motion of his wrists and arms. O'Brien was unable to squat or walk heel-to-toe, and his paraspinal muscles were in spasm when he bent forward at the waist to forty degrees. He had diminished lateral flexion of his spine, and diminished range of motion of his hips with his knees flexed. (R. 766) The doctor found O'Brien's muscle strength in his lower extremities to be 3/5. He noted the range of motion of O'Brien's lumbar spine was "diminished secondary to reported pain," and "[t]here was palpable vertebral tenderness over the cervical and lumbar spines." (R. 767)

On February 9, 2002, Lynell Carter-Dupont, M.D. reviewed the record and completed a Physical Residual Functional Capacity Assessment form. (R. 802-09) She found O'Brien should be able to lift twenty pounds occasionally and ten pounds frequently; stand, walk, or sit, with normal breaks, for a total of six hours in an eight-hour workday; push or pull without limitation, including operating hand or foot controls; balance frequently; climb ramps or stairs, stoop, kneel, crouch, or crawl occasionally; and never climb ladders, ropes, or scaffolds. She opined his obesity and leg weakness would preclude exposure to heights and other hazards, but otherwise he would have no environmental, manipulative, visual, or communicative limitations. (*Id.*) Another doctor reviewed and concurred in Dr. Dupont's findings on April 22, 2002. (R. 809)

On March 1, 2002, O'Brien underwent a mental status examination by Michael P. Baker, Ph.D. (R. 769-71) Dr. Baker noted O'Brien's mood was depressed and anxious and his "affect appeared congruent and restricted." (R. 770) He had adequate memory, and appeared to have unimpaired insight and judgment presently. He had depressive and anxious symptoms that the doctor opined would cause O'Brien "added difficulty in attending and concentrating on the work tasks." (*Id.*) He diagnosed O'Brien with Depressive Disorder, Polysubstance Abuse in Remission, and Anxiety Disorder NOS, and

assessed his GAF at 55, indicating moderate symptoms. (R. 771; *see* DSM-IV at 32 (4th ed. 1994).

On March 4, 2002, O'Brien saw a doctor at Siouxland Community Health, for purposes of getting established at the clinic and to obtain medication refills. He complained of pain in both arms and legs for the past two years. He stated Vicodin and Xanax had worked well for his pain control, and he was not currently on an antiviral regimen. The doctor prescribed Xanax and Vicodin, refilled Bactrim which O'Brien took prophylactically, and scheduled a follow-up appointment to discuss antiviral therapies. (R. 773, 776) O'Brien returned for follow-up on March 11, 2002. He stated the Xanax was making him sleep all day long, and he requested a switch to Valium, which was authorized by the doctor. He was started on antiviral therapy and his Bactrim was refilled. Otherwise, he reported "doing pretty good," and stated he was "trying to get established here in the community." (R. 775) Refills of Vicodin were authorized on March 18 and March 25, 2002. (R. 774, 776[2])

An X-ray of O'Brien's lumbar spine on April 16, 2002, indicated mild narrowing of the L4-5 disk space, but otherwise showed satisfactory alignment of his lumbosacral spine with no spondylosis, spondylolisthesis, or compression fracture. (R. 782)

On March 14, 2002, Dennis A. Weis, M.D. reviewed the record and competed a Psychiatric Review Technique form (R. 783-96), and a Residual Mental Functional Capacity Assessment form (R. 797-801). He concluded the record evidence indicated O'Brien had moderate cognitive restrictions of function, some difficulties with sustained concentration and attention, and "difficulties consistently performing extremely complex cognitive activities that would require prolonged attention to minute details and rapid

---

[2]Transcript pages 774-76 are duplicated at pages 815-17.

shifts in alternating attention." (R. 799) He opined that "[d]espite these restrictions, [O'Brien] is able to sustain sufficient concentration and attention to perform non complex, repetitive, and routine cognitive activity." (*Id.*)

Dr. Weis further concluded O'Brien would have moderate restrictions of function with social interactions when he is unduly stressed, and he "would function best in a setting where he [is] not required to have frequent, stressful contact with large numbers of individuals." (R. 799-800) He should be "able to sustain short-lived, superficial interaction with others when it is [in] his interest to do so," and to "sustain limited social interaction with others in appropriate ways when it is in his interested [sic] to do so." (R. 800) The doctor concluded O'Brien had medically-determinable impairments consisting of depressive disorder NOS, anxiety disorder NOS, polysubstance abuse disorder in remission, and avoidant personality disorder by history. While these impairments would create moderate restrictions of function, the doctor found they did not meet or equal the Listing requirements. (*Id.*) On July 11, 2002, David A. Christiansen, Ph.D. reviewed the file and affirmed Dr. Weis's findings. (R. 783)

Bruno J. Himmler, M.D. at Siouxland Community Health authorized further refills of O'Brien's Vicodin on April 1, 8, and 15, 2002. From the pattern of refills, it appears O'Brien was only prescribed one week's worth of medication at a time. O'Brien reported he was using the medication for muscle pain and was not over-using his medications. (R. 814) Further refills of Vicodin were authorized on April 22, April 29, May 6, May 23, May 31, and June 10, 2002. (R. 811-13) Refills of Valium were authorized on April 24, May 14, May 31, and June 10, 2002. (*Id.*) O'Brien appeared for regular follow-up visits with Dr. Himmler during this time period. Records from his follow-up visit on June 10, 2002, include the notation, "He was encouraged to continue working as much as he can." (R. 811) It is not clear what this notation references as there is no other

notation in the doctor's records regarding O'Brien working. The record also indicates O'Brien had been able to cut back on his use of Vicodin "to just twice a day," and he reported he was "doing pretty good." He was directed to return for follow-up in one month. (*Id.*)

On June 10, 2002, Dr. Himmler wrote a letter to the Iowa Department of Human Services, in which he provided the following opinion:

> Dennis O'Brien is a patent of mine, who is being treated for HIV. He is on some medications at this time and hopefully we're going to have a good response once we get his viral load and CD4 count to the desired levels. At this point he hasn't really developed any other chronic problems, outside of some chronic pain syndrome and anxiety disorder, and those are currently being medicated. His overall prognosis is pretty good at this time, but we have to wait and see how he responds to his anti-viral therapy.

(R. 843)

Dr. Himmler saw O'Brien on June 27, 2002, and diagnosed him with an ear infection. Records include a notation that O'Brien was applying for disability on the basis of his AIDS diagnosis. The doctor indicated O'Brien "does meet laboratory criteria for the AIDS diagnosis." (R. 844)

Stephen Elliott, Ph.D., D.O., completed a medical consultant review summary for Iowa Disability Determination Services on July 12, 2002. (R. 845-46) He found O'Brien's allegations of limitations not to be credible because O'Brien repeatedly stated his chronic pain syndrome and other symptoms were the result of his medications, yet he voluntarily stopped taking his medications for at least a year but continued to have the same symptoms. Dr. Elliott also stated O'Brien had claimed repeatedly "that he has AIDS when it is very clear that he has been told he only has an HIV infection and has not met any criteria for AIDS." (R. 846) This clearly differs from the treatment notes of

O'Brien's treating physician, Dr. Himmler, who noted O'Brien met the laboratory criteria for an AIDS diagnosis. (*See* R. 844)

It appears O'Brien went for several months without seeing a doctor. In December 2002, O'Brien informed Dr. Himmler's office that he was transferring to Dr. Paul Peterson, and his records were faxed to the Mercy Pain Clinic. However, it appears O'Brien changed his mind and continued seeing doctors at the Siouxland Community Health Center. On February 17, 2003, he saw Dr. Himmler with complaints of recurrent thrush and sore throat, and joint pains that he rated at a 10 on a 10-point scale. The doctor refilled O'Brien's Valium and Lortab until April 4, 2003, and told him that he could not get further refills until his next appointment. The doctor wanted to try a new pain management protocol with O'Brien, but he noted that when they had tried to wean O'Brien off pain medications in the past, O'Brien had become angry and left the clinic. The doctor later learned O'Brien had obtained a refill of his Valium prescription on February 10, 2003, so he cancelled the Valium refill he had given O'Brien at his appointment. (R. 848)

On February 18, 2003, O'Brien was seen at Mercy Medical Center for an infectious disease consultation for his HIV. (R. 851-53) He listed his current medications as Combivir, Sustiva, Bactrim, Valium, Hydrocodone, Marinol, and Viagra. O'Brien reported symptoms including decreased appetite, night sweats for at least the previous year, occasional sinusitis and wheezing, frequent runny nose and congestion in the morning, occasional headaches, diarrhea once a day, occasional blurry vision in his right eye, anxiety, and chronic joint pain that was noted to be "not very well delineated." (R. 852) O'Brien's CD4 count was 240 at this time, and the doctor noted that when they saw O'Brien in June, if his CD4 count was still over 200, he would be able to discontinue taking prophylactic Bactrim, which was causing him some stomach upset. (R. 853)

On February 28, 2003, O'Brien called Siouxland Community Health requesting a refill of his Valium prescription. The doctor declined the refill, and O'Brien was informed he would have to wait until March 10, 2003, to get the medication. O'Brien's next contact with the clinic was on March 20, 2003, when he called the clinic and was very angry and swearing. He stated he would get his medications and his care elsewhere. He stated he wanted no further contact or communication with anyone from the clinic. (R. 847)

On March 19, 2003, O'Brien was seen at the Family Medicine Clinic in Onawa, Iowa, to be established as a new patient at the clinic. He stated he had been seeing Dr. Previn in Omaha, for his HIV. He stated when he last saw Dr. Previn, his T-cell count had been greater than 200 and his viral load had been undetectable, which he noted was an improvement over past levels. O'Brien stated his HIV medications caused him to have joint pain for which he took Lortab. He also reported having "an incredible amount of anxiety." (R. 868) O'Brien stated he was new to the area, wanted to obtain a local family doctor, and planned to move to Onawa. O'Brien received prescriptions for Hydrocodone, Valium, and Amitriptyline, and was told these would have to last him for one month, when he was directed to return for follow-up. (R. 867)

O'Brien was seen in the Onawa clinic on April 16, 2003. He reported feeling well overall, "feeling quite good," and his medication regimen was working well for him. (R. 66) He requested refills of his medications, which he received, but the doctor told him they would control his narcotic use strictly. The doctor noted, however, that some chronic pain management was to be expected given O'Brien's "underlying process and medication side effects." (*Id.*)

O'Brien returned to the Onawa clinic for follow-up on May 7, 2003. He stated he was going to be out of town for three weeks, so he was requesting early refills of his

medications.  He complained of an itching sensation in his ankles and hands that appeared to be eczema-type, but the doctor noted it did not appear to be consistent with Kaposi's sarcoma.  O'Brien's medications were refilled.  He was given a copy of a "pain contract," which he agreed to read through and complete prior to his next appointment. (*Id.*)

On May 20, 2003, O'Brien was seen at Mercy Medical Center complaining of right mandibular pain which began after he bit down on something.  At the time of this treatment, O'Brien stated he was not taking any  medications.  He was diagnosed with a dental abscess and dental pain, and received prescriptions for Clindamycin and Vicodin. (R. 849)

At O'Brien's next exam at the Onawa clinic on May 27, 2003, he continued to report doing well on his current medication regimen.  Doctor's notes indicate he was on chronic pain management for peripheral neuropathy associated with his protease inhibitors.  His medications were refilled at the exam, and again on June 17 and 21, 2003.  (R. 865)

O'Brien was seen for follow-up at the Onawa clinic on June 24, 2003.  He reported doing fairly  well.  He stated he was fatigued, but noted he had just moved.  He was continued on Bactrim and his pain management medications.  (*Id.*)

On July 8, 2003, O'Brien returned to Siouxland Community Health to be reestablished as a patient for follow-up of his HIV.  Notes indicate he was "also looking at trying to get back on chronic pain meds with Hydrocodone and Valium." (R. 877)  He was told the clinic would not prescribe pain medications for him, and O'Brien got up to leave, but then agreed to talk to the HIV manager.  O'Brien agreed to be seen at the clinic for HIV management, and to get his pain medications elsewhere.  (R. 877)

O'Brien returned to the Onawa clinic for follow-up on July 16, 2003. He stated his mother had just had a major stroke, and he was going to Indiana to be with her. Otherwise, he continued to do fairly well. (R. 863) At O'Brien's next visit on July 18, 2003, he stated he had gone to see his mother in Indiana, and had forgotten to bring back his medications with him. He asked his family to send them, but according to O'Brien, they claimed the narcotics were missing, and he thought someone had taken them. He stated his family was in Ohio, so he could not file a police report here in Iowa. The doctor noted O'Brien had been following his pain contract. It appears his narcotic medications were refilled; however, prescription information has been redacted from the copies of this clinic's records in many instances. (R. 863; *see* R. 855-67)

On August 4, 2003, O'Brien called Siouxland Community Health to request a prescription for Marinol.[3] They offered to give him six tablets to hold him over until Dr. Himmler returned and O'Brien could see the doctor. O'Brien declined and said he would get the medication from his other doctor. He then called the Onawa clinic requesting a refill of Marinol. Doctors prescribed thirty tablets, and told O'Brien any further refills would have to come from his HIV provider. (R. 863)

On August 13, 2003, O'Brien returned to the Onawa clinic for follow-up and medication check. He was "concerned about getting Marinol for his appetite suppression." (R. 861) Doctor's notes indicate O'Brien had not yet provided the clinic with any laboratory test results or other documentation regarding his HIV status. The doctor ordered lab tests, noting the clinic had "no documentation on him and have some

---

[3]Marinol is a brand name for the drug Dronabinol, an anti-nausea medication and appetite suppressant. The drug "is an orally active cannabinoid which, like other cannabinoids, has complex effects on the central nervous system (CNS), including central sympathomimetic activity." One common side effect of the drug is a "dose-related 'high' (easy laughing, elation and heightened awareness)." (From www.rxlist.com for "Marinol" or "Dronabinol.")

suspicion for narcotic seeking behavior." (R. 861) A call to the pharmacy indicated O'Brien had obtained Lortab refills on June 2, 2003, and July 8, 2003. The doctor noted O'Brien had a very high Hepatitis C viral load, and his HIV viral load was rising. O'Brien had macrocytic anemia, and his CD4 counts were below 400, indicating he had "an AIDS simplex complex." (*Id.*) The doctor was concerned that O'Brien might not be taking his HIV/AIDS medications, and asked him to bring in all of his medication bottles at his next visit. The doctor noted, "I do feel we can still care for this patient despite his first violation of the pain contract as long as he has no others. However, I'm mostly concerned that he's not getting treatment for the underlying illness. He's following with Dr. Neuharth, and she is aware of the situation." (*Id.*)

On August 28, 2003, O'Brien was seen for follow-up at Siouxland Community Health. He stated he had blood work drawn elsewhere and was awaiting the results. He was "doing okay for his medication supplies except for his Marinol [which] he needs refilled; he takes 5 mg. [twice daily] and was given another 30 day supply." (R. 877) Otherwise, he reported doing well. (*Id.*) The same day, O'Brien called the Onawa clinic to request a refill of Marinol. The refill was declined, and he was told he needed to bring in all of his medication bottles before he could obtain further refills. (R. 862)

O'Brien returned to the Onawa clinic for follow-up on September 10, 2003. He reported doing well and stated he was taking his medications. He requested medication refills, and received refills of Marinol, Valium, and Lorcet. He was told to return for follow-up in two months. (R. 860)

On September 17, 2003, O'Brien called the Onawa clinic to request early refills of his Valium and Lorcet, only enough to last until November 2nd. He stated his mother had passed away in Indiana, and he was traveling there to handle her funeral and estate matters. The refills were authorized. (*Id.*)

On September 22, 2003, O'Brien was seen at Siouxland Community Health for follow-up. He reported trouble with some numbness in his hands and his hands falling asleep. He stated it affected all four fingers and his thumb. He also reported some problems lifting his arm up over his head. Dr. Himmler prescribed Soma for a week to "calm down the tendinitis in his shoulder." He also prescribed activity and exercise to loosen up the shoulder, and vitamin B6 to help with the peripheral neuropathy symptoms. He noted if symptoms had not improved in a month, he would order EMG studies. (R. 876)

On September 28, 2003, O'Brien was seen in the emergency room in Sioux City, with complaints of fever, chills, and diarrhea. Doctors prescribed Phenergan suppositories for nausea, with no refills authorized; Tylenol for fever; and clear liquids or light diet for twenty-four to forty-eight hours. (R. 882-83)

On October 4, 2003, O'Brien returned to the Onawa clinic complaining of head congestion and a nonproductive cough. He had been taking Hydrocodone 10/325 three times daily, and stated the dosage was too high for him. He requested a lower dosage of both the Hydrocodone and Valium. Notes indicate he was "pleasant, cooperative, well nourished and well hydrated." (R. 859) He was instructed to bring in his remaining Hydrocodone and Valium for the clinic to dispose of, and then they would write him new prescriptions for the lower dosages. (*Id.*)

On October 27, 2003, O'Brien saw Dr. Himmler with continued complaints of pain in his right shoulder. He stated the Soma had not helped and he asked for something else. The doctor prescribed Celebrex. He also increased O'Brien's Marinol to 10 mg. twice daily. (R. 875)

O'Brien was seen at the Onawa clinic on November 5, 2003. Notes indicate he was "really doing well," and he denied any significant problems. He noted he could cut

down on his Hydrocodone and Valium during the winter because he was "not quite so active." His weight was stable. He was continued on his medications, which at that time were Amitriptyline 50 mg. at bedtime, Hydrocodone 7.5/500 three times daily, Combivir 600 mg twice daily; Bactrim DS 3 times a week; Valium 5 mg three times daily; and Marinol 5 mg twice daily. (R. 858)

O'Brien returned to the Onawa clinic for follow-up on November 21, 2003. He stated the 7.5/500 Hydrocodone dosage was not strong enough, and he complained of a runny nose, cough, and congestion. Because of the nice weather, he had been more active than anticipated, so he thought he should return to his summertime dosage of the pain medications. His Hydrocodone was increased to 10/325 and Valium to 10 mg twice daily. (R. 857-58)

O'Brien returned to Siouxland Community Health for follow-up on December 16, 2003. He reported having a lot of pain and stated the Celebrex was not working. He asked for Lortab or other pain medication, and Dr. Himmler again stated he would not prescribe narcotics for O'Brien "given his past history." (R. 873) He prescribed Mobic for pain control. (*Id.*)

O'Brien was seen at the Onawa clinic on December 31, 2003, for follow-up and a recheck of his viral load. He reported doing well. His medications were refilled. (R. 856) On January 20, 2004, the doctor called Walgreen's pharmacy and instructed that no further refills of Marinol were authorized until O'Brien was seen again in the clinic. (R. 856) On January 21, 2004, his prescriptions for Hydrocodone and Valium were refilled at Thompson Dean Drug. On January 26, 2004, an Indiana pharmacy called Thompson Dean drug to request authorization for further refills, stating O'Brien was in Indiana settling his mother's estate. The refills were declined at that time, and O'Brien's wife was informed that if O'Brien was still in Indiana at the end of February, when his

next refills were due, then the Indiana pharmacy would have to call for the refills. (R. 755-56)

On January 2, 2004, Kimberly A. Neuharth, M.D. wrote a letter in which she stated O'Brien "has what is classified as full-blown AIDS complex." She noted his CD4 count had been under 200, but she did not state when or for how long. She noted O'Brien also has Hepatitis C, and he "has had Kaposi sarcoma as well." (R. 854) He was taking his medications as directed and was "doing better but, again, he's classified as full-blown AIDS." (*Id.*)

On January 22, 2004, O'Brien cancelled a follow-up appointment with Dr. Himmler, but he attended a support group session at Siouxland Community Health. (R. 873)

On January 27, 2004, Hy-Vee Pharmacy called the Onawa clinic to report a concern that O'Brien was receiving pain medications from more than one physician. He had received Percocet that date from a Dr. Zoelle. He had also received Valium and Hydrocodone from another Sioux City physician at Thompson Dean Drug. Hy-Vee requested a Drug Alert to keep an eye on O'Brien's prescriptions. (R. 855) On January 28, 2004, the clinic wrote a letter to O'Brien stating they would no longer refill his prescriptions. (*Id.*) The same date, O'Brien's records were mailed to Riverside Family Practice in Sioux City, per O'Brien's request. (*Id.*)

O'Brien returned to Siouxland Community Health for follow-up on March 23, 2004. Notes indicate Dr. Himmler was leaving, and O'Brien was seeing a new physician at the clinic. O'Brien reported he had been seeing Dr. Neuharth in Onawa for pain management, and she also had left, so he needed a new pain management physician. He noted he and Dr. Himmler "were not able to manage his pain here." He reported chronic use of Hydrocodone, Valium, and Amitriptyline from Dr. Neuharth. He was unsure

whether the Amitriptyline was helping, but he requested refills of medications including Marinol, stating he was nauseated every morning. The doctor noted O'Brien had never discussed or signed a pain contract at this clinic, and he included the following in the treatment record:

> I did confront him with the fact that in the chart it looks like he had been receiving narcotics from multiple providers and [he] vehemently denied that this was the case. The [patient] relates he is quite frustrated with the fact that no one seems to want to continue these pain meds for him and I told him that we would work very specifically with him. He was unable to continue his relationship with another physician, he would need to abide by our current pain management regimen which includes trying to get him off of chronic narcotics or get him switched over to something such as Methadone therapy. The [patient] relates this does not work for him and he is just really not interested in that. Instead of trying to manage both of his disease processes here[,] I told him that we would certainly try to manage his HIV care and then he could seek his pain medication care from someone else so as to not disrupt his HIV care rapport with us. The [patient] verbalized that this would be fine and we could get old records from his other doctors. However, apparently later, after our visit, he met with the nutritionist. He told Team 8 that he was not interested in getting his HIV care here either, because we are not going to manage his pain. The [patient] in the room was very agreeable with me in terms of this, but apparently had changed his mind and was unwilling to sign for us to get records from his other doctors, etc. I asked the [patient] why he was having so much pain or what the area of pain was, so we could potentially address the cause, [and] he related it was from "my AIDS". I asked [him] if there were specific problems and he related his back. I asked him if he had an MRI and he said that he was apparently unable to tolerate being in the MRI scanner. He related he was somewhat claustrophobic and apparently this was just not the

case for him. The [patient] also noted to have positive hep C. He does relate that he is taking his meds without difficulty, other than the daily nausea, but he has been having that for a long time. The [patient] apparently is not currently working at this time and has chronic pain syndrome as a diagnosis. Also, has a history of narcotic abuse, per Dr. Himmler's notes. He had been given multiple other meds, such as Mobic, but he relates he has not been taking those.

(R. 870, 872)

The doctor offered to prescribe Phenergan and Zofran, rather than Marinol, but O'Brien declined. The doctor noted he hoped O'Brien would return to the clinic because he "certainly needs continued HIV care." (R. 872)


**5.    *Vocational expert's testimony***

The ALJ asked VE Elizabeth Albreck the following hypothetical question:

My first assumption is that we have an individual who is 39 years old and will be 40 years old as of September 7. He's a male. He has a limited education in special education. He has past relevant work as you indicated in [the VE's summary], and he has the following impairments. He has HIV with AIDS, hepatitis C, medically determinable impairment resulting in chronic pain syndrome, obesity, a history of anxiety and depression, and chronic substance abuse. And as a result of a combination of those impairments, he has the residual functional capacity as follows. He has – cannot lift more than 20 pounds, routinely lift 10 pounds with only occasional bending, stooping, squatting, kneeling, crawling, or climbing. This individual should not work at unprotected heights, and he should not be exposed to excessive heat, humidity, or cold. He is not able to do very complex or technical work, but is able to do more than simple, routine, repetitive work that does not require constant or very close attention to detail. He does need

occasional supervision.  He should not work at more than a regular pace, and that's using three speeds of pace being fast, regular, and slow.  And he should not work at more than a mild to moderate level of stress.  Would this individual be able to perform any job he previously worked at either as he performed it or as it is generally performed within the national economy?

(R. 86-87)

The VE opined the hypothetical individual would be limited to the full range of unskilled, light work, and would be precluded from all of O'Brien's past relevant work. (R. 87-88)  He would not have acquired any skills that would transfer to other work within the limitations of the hypothetical question.  (R. 88)  Examples of jobs the individual could perform would include marker, "in the category of stock clerk and order filler"; assembler of small products I, "in the category of production workers"; and cleaner/housekeeper, "in the category of maid/janitor/cleaner." (R. 88-89)

The ALJ then asked the VE a second hypothetical question, as follows:

My next hypothetical would be an individual of the same age, sex, and education and past relevant work and impairments as previously specified.  And this would be an individual who would have a residual functional capacity as follows.  This individual could not lift more than 20 pounds, routinely lift 10 pounds, with no standing of more than one to one and a half hours at a time, no walking of more than one to two blocks at a time, and walking or standing is limited to three to four hours out of an eight-hour day, sitting of one to one and a half hours at a time, sitting limited to two to three hours out of an eight-hour day with only occasional bending, stooping, squatting, kneeling, or crawling, only occasional gripping or gross or fine manipulation.  This individual should not be exposed to excessive heat, humidity, or cold. He should not work at unprotected heights.  He does require access to restroom facilities.  He is not able to do very

> complex or technical work, but is able to do more than
> simple, routine, or repetitive work that does not require
> constant very close attention to detail. He does require
> occasional supervision. He should not work at more than a
> regular pace. And he should not work at more than a mild to
> moderate level of stress. I assume this individual could not
> return to past relevant work or transfer prior work skills, is
> that correct?

(R. 89-90)

The VE agreed the hypothetical individual would be unable to return to O'Brien's past work and would not have transferable work skills. Further, with the limit of three to four hours of standing and two to three hours of sitting in an eight hour day, the VE assumed at least some of the individual's time would be spent lying down, which would preclude competitive employment. (R. 90)

Returning to the first hypothetical, but adding the requirement that the individual would have to be able to take unscheduled bathroom breaks throughout the day, the VE was unable to state definitively whether that would preclude competitive employment. She noted it would depend on whether the individual was well enough to stay and complete the job. She also noted "a recent article from the industrial commissioners" advised employers to allow employees unscheduled bathroom breaks. (R. 90-91)

If the individual in the first hypothetical would have to miss at least three days of work each month due to illness, the VE opined that would preclude the individual from competitive employment. (R. 91)

## 6. The ALJ's decision

The ALJ found O'Brien "has severe impairments in combination which include HIV with AIDS; hepatitis C and B; obesity; history of anxiety and depression; history

of substance abuse; and medically determinable impairment resulting in a chronic pain syndrome"; but no impairment or combination of impairments met the Listing requirements. (R. 29 ¶ 2) The ALJ specifically discounted O'Brien's claims of disabling neuropathy, numbness, and poor grasp strength in both hands, finding those allegations to be contradicted by the medical evidence. (R. 21) The ALJ also found no evidence that O'Brien is disabled in any way by Kaposi's sarcoma. (*Id.*)

The ALJ similarly discounted O'Brien's claims of disabling weight loss, diarrhea, and lesions or sores on his legs, again finding the medical evidence to be inconsistent with O'Brien's allegations. (R. 22-23)

The ALJ found O'Brien's subjective claims regarding his limitations not to be fully credible. The ALJ found the discrepancy between O'Brien's claims and the medical evidence suggested O'Brien "had not been completely forthright in providing information to treating and evaluating medical individuals." (R. 21) The ALJ further noted references in the record indicating O'Brien did not take his medications as directed, he had exhibited narcotic-seeking behavior, and he had "consistently misrepresented information to others." (R. 23-25)

Regarding O'Brien's mental condition, the ALJ found O'Brien had "not sought persistent treatment for any purported mental symptoms or impairments" (R. 25), and his degree of limitation due to psychologically-based symptoms "has been mild." (R. 26)

The ALJ further observed that O'Brien has a poor work history, which detracts from the credibility of his allegations. The ALJ found "[t]he record as a whole indicates that when [O'Brien] takes medications appropriately, they have been effective in reducing/controlling symptoms to a degree," and he had not experienced any untoward side effects from his medications for any twelve-month continuous period. (*Id.*)

The ALJ did not credit O'Brien's claim that he is unable to get out of bed three or more days per month, noting the medical records do not indicate he "had persistently shared this seemingly significant flare-up of symptoms" with his doctors. (R. 27) The ALJ found no evidence in the record that O'Brien had complained persistently of fatigue, or limitations on his ability to walk, sit, stand, or perform other work-related functions. (*Id.*)

The ALJ discounted the testimony of O'Brien's wife and the home health care worker. The ALJ noted Sharon O'Brien "has a financial interest in aiding in the claimant's receipt of benefits." (R. 28) The ALJ found O'Brien had misrepresented his condition to others, intimating O'Brien was malingering in the health worker's presence, "so that the information or appearances concerning his functioning are what he wishes to represent to her." (R. 28)

In summary, the ALJ found O'Brien's complaints to be credible only to the degree reflected by the ALJ's residual functional capacity determination. (R. 27) The ALJ concluded O'Brien's "capabilities are greater than what he has sought to represent to others or allowed others to do for him." (R. 28)

The ALJ found O'Brien retains the following residual functional capacity:

> [B]ased on the record as a whole, the claimant has had the residual functional capacity to perform the physical exertional and nonexertional requirements of work except for lifting more than 20 lbs. maximum or 10 lbs. repeatedly. He can occasionally bend, stoop, squat, kneel, crawl, and climb. He should avoid exposure to excessive hot, humid, and cold conditions. He should avoid heights. He is not able to do very complex-technical work, but is able to do more than simple, routine, repetitive work The work should not require constant, very close attention to detail. He needs occasional

supervision.  He should not work at more than a mild to moderate level of stress or more than a regular pace.

(*Id.*)

Although the ALJ found O'Brien is not able to return to any of his past relevant work and he has no transferable skills, the ALJ nevertheless concluded O'Brien could perform unskilled jobs consistent with the VE's testimony.  (R. 29)  As a result, the ALJ found O'Brien was not disabled and not eligible for SSI.  (R. 29-30)

## III.  DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A.  Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505.  A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.  20 C.F.R. §§ 404.1520 & 416.920; *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)).  First, the Commissioner will

consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past

relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon, supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857

(8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v).

### B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court must affirm the ALJ's factual findings if they are supported by substantial evidence on the record as a whole. *Id.* (citing *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002); *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *Kelley v. Callahan*, 133 F.3d 583, 587 (8th Cir. 1998) (citing *Matthews v. Bowen*, 879 F.2d 422, 423-24 (8th Cir. 1989)); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier, id.*; *Weiler v. Apfel*, 179 F.3d 1107, 1109 (8th Cir. 1999) (citing *Pierce v. Apfel*, 173 F.3d 704, 706 (8th Cir. 1999)); *accord Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citing *Craig v. Apfel*, 212

F.3d 433, 436 (8th Cir. 2000)); *Hutton v. Apfel*, 175 F.3d 651, 654 (8th Cir. 1999); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022 (citing *Craig*, 212 F.3d at 436); *Willcuts v. Apfel*, 143 F.3d 1134, 1136 (8th Cir. 1998) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S. Ct. 456, 464, 95 L. Ed. 456 (1951)); *Gowell*, 242 F.3d at 796; *Hutton*, 175 F.3d at 654 (citing *Woolf*, 3 F.3d at 1213); *Kelley*, 133 F.3d at 587 (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo.*" *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young*

*v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations

by third parties and treating and examining physicians relating
to such matters as:

    1)       the claimant's daily activities;

    2)       the duration, frequency and intensity of the
            pain;

    3)       precipitating and aggravating factors;

    4)       dosage, effectiveness and side effects of
            medication;

    5)       functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d
576, 580-81 (8th Cir. 2002).

## IV.  ANALYSIS

The record in this case presents conflicting evidence regarding O'Brien's
condition. On one hand, the record substantiates O'Brien's claim that he has AIDS, he
suffers from frequent diarrhea, he has some neuralgia related to his antiviral medications,
and he sometimes requires the assistance of others to complete certain tasks, such as
putting on and tying his shoes.  On the other hand, the record also indicates O'Brien has
demonstrated drug-seeking behavior, and suggests he may be addicted to narcotic pain
medications.  He has given inconsistent information to his medical providers at times, and
he has a poor overall work record.  These conflicting factors make more difficult a
determination as to whether O'Brien is disabled.

O'Brien argues the ALJ erred in failing to consider the determination of the Iowa
Department of Human Services that he needs "at least a nursing home level of care."
(Doc. No. 7-1, p. 12)  The record contains evidence that O'Brien was approved as of
July 1, 2002, for State medical assistance through the AIDS/HIV Waiver program.
(R. 517)  O'Brien attaches to his brief a copy of the guidelines for the AIDS/HIV Waiver

program that make it clear the Iowa Foundation for Medical Care had to determine O'Brien was in need of "Nursing Facility or Hospital level of care" before he would qualify for the waiver program. (*See* Doc. No. 7-2, page 2 of 9)

However, as the Commissioner points out in her brief, the ALJ did not have that information before him for consideration. All the ALJ had was a single page notice that O'Brien had been approved to receive medical assistance. (R. 517) The record contains no information about the requirements for the State's waiver program, or the evidence or criteria used to determine that O'Brien qualified for the State program. Thus, the court finds no error in the ALJ's failure to consider the Iowa DHS's determination. *See* 20 C.F.R. § 404.1520(3) ("We will consider all evidence *in your case record* when we make a determination or decision whether you are disabled." Emphasis added.) *See also* 20 C.F.R. § 404.1504 (decision by another government agency based on its rules not binding; disability determination must be based on Social Security law).

O'Brien also argues the ALJ erred in rejecting the testimony of O'Brien's wife and the home health care worker. The ALJ considered the third parties' testimony, but concluded the testimony was not supported by the record evidence. The court concurs in the ALJ's reasoning for discounting the testimony of O'Brien's wife and the home health care worker.

As noted above, the facts of this case are difficult to reconcile. If one were to rely solely on O'Brien's testimony, he would appear to be disabled and unable to complete even the most basic of tasks. However, the medical evidence does not support O'Brien's claims regarding his limitations. Not only does the medical evidence fail to contain objective testing and examination findings consistent with O'Brien's testimony, the treatment notes do not contain evidence that O'Brien made the same types of complaints to his physicians that he made during the ALJ hearing. He repeatedly told his physicians

that he was doing relatively well, or in some cases, that he actually was improving and doing very well. He indicated he was active during nice weather, and reduced his activity during the winter, indicating he was engaged in activities beyond the level of ability he described during the ALJ hearing. Further, his credibility is questionable given his drug-seeking behavior and inconsistent reporting to his physicians.

Viewing the evidence as a whole, the undersigned is unable to conclude that the ALJ erred in his analysis. The undersigned finds the record contains substantial evidence to support the ALJ's conclusion that O'Brien retains the residual functional capacity to perform unskilled, light work.

## V. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[4] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1)(C) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be affirmed.

**IT IS SO ORDERED.**

**DATED** this 6th day of September, 2005.

_____
PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[4]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).